DOWNEY BRAND LLP
R. DALE GINTER (Bar No. 100784)
MARY OLDEN (Bar No 109373)
621 Capitol Mall, 18th Floor
Sacramento, CA 95814-4731
Telephone: (916) 444-1000
Facsimile: (916) 444-2100
dginter@downeybrand.com
molden@downeybrand.com

Attorneys for Debtor
Big Black Dogs, LLC

UNITED STATES BANKRUPTCY COURT

EASTERN DISTRICT OF CALIFORNIA

In re:

Big Black Dogs, LLC,

    Debtor.

Case No. 10-49712

Docket Control No. DB-1

**DEBTOR'S MOTION FOR AUTHORITY TO USE CASH COLLATERAL**

Date: November 15, 2010
Time: 10:30 a.m.
Dept.: Ctrm D
Place: US Bankruptcy Court
501 I Street, 6th Floor
Sacramento, CA 95814
Judge: The Honorable Robert S. Bardwil

## I. INTRODUCTION AND JURISDICTION

Big Black Dogs, LLC, a California limited liability company, ("BBD" or "Debtor") filed its Chapter 11 Petition on November 10, 2010.

This Court has jurisdiction over this cash collateral motion pursuant to 28 U.S.C. §§ 1334 and 157 and 11 U.S.C. § 363. This matter is a core proceeding.

## II. RELIEF REQUESTED.

BBD owns 3 parcels of real estate in Yuba City, Sutter County, California. (See Declaration of Grover Scott Black ("Black Decl.") filed herewith, at ¶ 2). These 3 parcels

include the Palisade Plaza, a small shopping center ("Plaza"), the Palisade Hotel, an 83 room hotel ("Hotel") and vacant parcel across the street from the Hotel of about a 1/2 acre ("Vacant Parcel"). (See Black Decl., at ¶ 2.)

The Plaza is a 12 unit retail shopping center immediately adjacent to the Hotel consisting of 15,954 square fee of rentable space, of which, 14,627 square fee is presently occupied. The Plaza currently generates $27,030.00 in monthly rents and no tenant is presently past due. (See Black Decl., at ¶ 3.) The Hotel is a two story, 83 room hotel with room rental rates ranging from $45 to $60 a night. Among its many amenities, the Hotel offers a conference room, a laundry facility, and vending machines. In addition, the Hotel is in close proximity to numerous restaurants, bars and lounges, and is conveniently located one block from California State Route 99. (See Black Decl., at ¶ 4.)

Umpqua Bank ("Bank") made two loans to BBD's predecessor in interest, one on the Plaza and the other on the Hotel and Vacant Parcel. (See Black Decl., at ¶ 5.)

The rents at the Plaza are sufficient to service the Bank's loan encumbering it (the loans are cross-defaulted, but not cross-collateralized). (See Black Decl., at ¶ 8.) However, due to problems not of BBD's making, the Hotel's revenues have not been sufficient to service that Bank's loan on the Hotel. Before debt service, the Hotel is currently operating with an approximate negative cash flow of $3,000.00. The Hotel's negative cash flow, however, is offset by the Plaza's positive cash flow. The total revenues are sufficient to meet operating expenses and provide the Bank with adequate protection while the BBD reorganizes under this Chapter 11. (See Black Decl., at ¶ 8.)

Therefore, BBD requests this Court to authorize the use of the Bank's cash collateral pursuant to Bankruptcy Code § 363 and Federal Rule of Bankruptcy Procedure ("Bankruptcy Rules), Rule 4001(b).

### III. THE BANK'S LOANS, BLACK'S LOANS AND BBD'S OWNERSHIP.

On December 17, 2002, Jacobus Justin Bor ("Bor"), borrowed $2,735,149.00 from Feather River State Bank (ultimately acquired by the Bank) to purchase the Hotel (the "Hotel

Loan")[1]. The Hotel is located at 965 Gray Avenue, Yuba City, California 95991. The Hotel Loan was secured by a first deed of trust. (See Black Decl., at ¶ 9.)

Five years later, on May 25, 2007, Bor obtained a second loan from the Bank in the amount of $2,747,815.00 to enable him to purchase the Plaza, a small shopping center located adjacent to the Hotel (the "Plaza Loan"). The Plaza Loan was secured by a deed of trust (the Plaza and Hotel are collectively referred to hereinafter as the "Properties"). (See Black Decl., at ¶ 10.)

Apparently, business did not go well for Bor because he needed to borrow money by early 2009. Bor borrowed $1,750,000 from, Grover Scott Black (hereinafter "Black") on April 1, 2009 (the "Black Loan"). The Black Loan was secured by a second priority deed of trust behind the Bank on the Properties. A mere five months after the Black loan was made, Bor defaulted. Black subsequently began foreclosure proceedings against the Properties which ultimately resulted in Bor granting the Properties via a deed in lieu of foreclosure to Black's limited liability company named Big Black Dogs, LLC ("BBD").[2] BBD acquired the Properties on March 8, 2010. (See Black Decl., at ¶ 11.)

When BBD became the Properties' owner, the Hotel was carrying $180,000 in trade debt and approximately twenty of the Hotel's eighty-three rooms had been closed due to extensive water damage. As a result, BBD was forced to invest about $28,500 to bring these rooms back into service, and, in the process, enhance the Bank's collateral. In addition, Black, through BBD, invested another $33,015 to keep the vendors supplying the Hotel. (See Black Decl., at ¶ 12.)

Meanwhile, and not surprisingly, the debt service owing to the Bank was too much for BBD's cash flow to handle. BBD, through Black, reached out to the Bank to garner some patience and understanding, in the form of a forbearance and interest rate reduction, to provide BBD with time to improve the Hotel's cash flow. Over the next five to six months, Black made multiple proposals to the Bank to modify the terms of the Hotel and Plaza Loans,

---

[1] Feather River State Bank was subsequently purchased by Umpqua Bank which currently holds the Hotel Loan.
[2] BBD was named for Black's two "big" black dogs – a Chihuahua and miniature poodle.

1120879.4

3

including extensions, potential buyouts, interest only payments and various proposals to pay a reduced amount of interest and principal. Throughout these negotiations, BBD continued to make debt service payments on the Plaza until August 6, 2010, while struggling to remain current with the Hotel's operating expenses. During the negotiations, BBD even made two payments on the Hotel Loan and offered to make interest only payments. The Bank refused this offer as well. (See Black Decl., at ¶ 13.) Currently, the amounts owing on the Hotel Loan and Plaza Loan are approximately $2,176,528 and $2,698,850, respectively. Black believes, however, that the Hotel is worth $1,500,000, while the Plaza is worth $2,200.000. (See Black Decl., at ¶¶ 6,7.)

Despite the Bank's expression of willingness to negotiate with BBD the Bank's sole response to BBD's multiple proposals was the Bank's demand for BBD to grant the Hotel to the Bank in exchange for a mere promise to "work something out" on the Plaza Loan. Without being able to reach an acceptable agreement with the Bank, BBD was forced to file its Chapter 11 bankruptcy petition on November 10, 2010 (the "Petition Date").

## IV. ARGUMENT AND AUTHORITIES

BBD is a creditor which acquired the Subject Properties as a result of Bor's default. BBD was not a party to the Loan Documents. BBD has obtained some but not all the loan documents[3] and is thus unable to completely analyze the Bank's rights under its loan documents. For purposes of this motion only, BBD assumes without admitting that the Bank has perfected its security interests in rent. BBD believes that the Plaza Loan and Hotel Loan are cross-defaulted but not cross-collateralized.

BBD seeks this Court's authority to use the Bank's putative cash collateral while reorganizing. There are two legal basis that permit BBD's use of cash collateral. First, under California Law the Bank's security interest in the rents is limited to amounts not necessary for maintenance and operation of the Properties. Secondly, the Bank's interests are adequately protected and authority should also be granted under Bankruptcy Code §363.

---

[3] BBD understands that the Bank is protective of its borrower's privacy, and does not imply any wrongdoing on the Bank's or Bor's part.

1120879.4

4

A.   CALIFORNIA LAW GOVERNS THE BANK'S INTEREST IN THE PAYMENTS.

State law governs interests in property unless specifically overridden by a provision of the Bankruptcy Code. *Butner v. United States*, 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979). Courts have consistently followed *Butner*, applying state law in analyzing a secured lender's rights in rents and similar payments.

> Determining whether federal or state law governs a dispute between a bankruptcy trustee and a mortgagee over the right to the rents collected between the mortgagor's bankruptcy and the foreclosure sale, the Supreme Court unanimously held that state law was determinative. *Butner v. United States*, 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979). The court emphasized the desirability of having "the basic federal rule" be "that state law governs." *Id.* at 57, 99 S.Ct. at 919. Although the precise question at issue here is not the same as in *Butner*, we see no federal reason requiring a different result and "no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding." *Id.* at 55, 99 S.Ct. at 918.

*Financial Security Assurance, Inc. v. Days California Riverside Limited Partnership*, 27 F.3d 374, (9th Cir. 1994).

B.   CALIFORNIA LAW REQUIRES THE APPLICATION OF RENTS, ISSUES AND PROFITS TO THE PROTECTION OF THE REAL PROPERTY.

California Civil Code ("CC") § 2938 provides for the assignment of interests in rents, issues and profits of real property, and perfection and enforcement of assignment rights. Those assignment rights, however, are subject to an obligation to expend the rents, issues and profits to preserve and protect the real property:

> (g)(1)   If the assignee enforces the assignment under subdivision (c) by means other than the appointment of a receiver and receives rents, issues, or profits pursuant to this enforcement, the assignor or another assignee of the affected real property may make written demand upon the assignee to pay the reasonable costs of protecting and preserving the property, including payment of taxes and insurance and compliance with building and housing codes, if any.

BBD herby makes demand on the Bank to permit the use of the rents, issues and profits of the Properties for the purposes which CC § 2938(g)(3) requires.   In effect, CC §

1120879.4                                          5

2938(g)(3) is a limitation on a secured lender's rights to the rents, issues and profits that comprise its collateral.

### C. THE BANK'S SECURITY INTEREST IS ADEQUATELY PROTECTED.

Bankruptcy Code § 363(c) and (e) permit this Court to authorize the use of cash collateral upon a finding the Bank's security interest is adequately protected.

BBD believes the present value of the Hotel to be about $1,500,000. Because of the senior lien of the past due property taxes, the Bank's secured claim amount with regard to the Hotel is approximately $1,428,000. As to Plaza, BBD believes its value to be about $2,200,000, which after deducting past due property taxes, leaves the Bank with a secured claim of around $2,138,000. It's axiomatic that the only amount entitled to adequate protection is the amount of the Bank's secured claim. *United Savings Assn of Texas v. Timbers of Inwood Forest Associates, Ltd.*, 484 U.S. 365 (1988)

Attached as Exhibit A is BBD's cash flow projection and cash collateral budget for November and December 2010 and January 2011 ("Budget"). See Declaration of Black ("Black Decl.") and the Declaration of Richard Gerdts, CPA ("Gerdts Decl."). The Budget is divided into 3 columns, the first column is budget for the combined Properties, the second column is for the Hotel and the third column is for the Plaza. Not including the Bank's debt service, the Plaza generates a positive monthly cash flow of about $23,000, while the Hotel is operating at about a negative ($1,500) per month cash flow. See Gerdts and Black Decls.

The Budget was reviewed and prepared by BBD's accountant Richard Gerdts ("Gerdts"), CPA, 4910 Campus Drive, Newport Beach, CA. 92660 . In order to prepare the Budget, Black provided Gerdts with the applicable documents, including the rent rolls for the Plaza and other financial information and management assumptions. The Budget for the Plaza is based upon the rent roll and the actual rents received, and actual expenses incurred, during the past few months. Black carefully reviewed the Budget and believes that it accurately sets forth his management assumptions and projections and that the Plaza's income and expenses are stable. (See Black Decl. at ¶ 16.)

The Hotel's revenue and expenses are naturally more volatile than the leased up,

stabilized Plaza's. The Hotel's expenses are relatively stable and are based upon the actual expenses from recent months. The budgeted revenues for the Hotel are conservative, based upon recent months and the trend line of revenues, while factoring in seasonality. Mr. Black believes the Hotel will achieve, and probably exceed, the Budget. (See Black Decl. at ¶ 17.)

The Budget provides for payment of all ongoing operating expenses and the real property tax installment due on December 10, 2010. All of the operating expenses proposed to be paid (called "Operating Out-Flows" in the Budget) are actual and necessary expenses of operating and preserving the properties and accordingly fit within the types of expenditures which the Bank would be required to pay were it collecting the rents. See Cal. CC § 2938(g)(1) (See Black Decl. at ¶ 17.)

As briefed, the Bank's security interest in bankruptcy is no greater than under state law. Therefore, since California law requires this "carve out" from the Bank's security interest the Court should find that to the extent the rents and profits are used to pay the budgeted expenses that such rents and profits are, in effect, not the Bank's collateral.

Alternatively, the Budget demonstrates that Bank's collateral is being protected and preserved and authorize BBD to use the Debtor's cash collateral.

## V. TERMS OF AUTHORIZATION REQUESTED

1. BBD requests the use of the Bank's cash collateral as provided for in the Budget.

2. BBD requests that the Bank be provided with a replacement lien in post-petition rents and revenues from the Hotel and Plaza.

3. BBD will pay the Bank an adequate protection payment of $7,000.00 per month commencing December 1, 2010.

4. BBD requests the interim use of cash collateral until a final hearing can be held in early December, 2010.

## VI. CONCLUSION

The Bank's security interest is adequately protected. Continued operation of the Hotel and Plaza is the only sensible course of conduct. California law recognizes that rents and

1120879.4

7

profits must be used to maintain the property (Cal. CC § 2938) and have so limited a secured creditor's rights. Under the Bankruptcy Code the use of cash collateral can be authorized when the secured creditor's rights are adequately protected. Using the Bank's cash collateral to operate while BBD reorganizes will provide adequate protection to the Bank.

DATED: November 10, 2010          DOWNEY BRAND LLP

By: _____
R. DALE GINTER
Attorney for Debtor
Big Black Dogs, LLC

**Big Black Dogs, LLC**
**Cash Collateral Forecast**

| | Combined | | | Palisade Hotel | | | Palisade Plaza | | |
|---|---|---|---|---|---|---|---|---|---|
| | Nov 10 | Dec 10 | Jan 11 | Nov 10 | Dec 10 | Jan 11 | Nov 10 | Dec 10 | Jan 11 |
| **Beginning Cash** | 5,999 | 26,899 | 19,482 | 4,754 | 2,455 | (14,710) | 1,245 | 24,444 | 34,192 |
| **Cash In-Flows** | | | | | | | | | |
| Cash Received from Hotel Rates / Rents | 62,030 | 62,030 | 62,030 | 35,000 | 35,000 | 35,000 | 27,030 | 27,030 | 27,030 |
| **Total Cash In-Flow** | 62,030 | 62,030 | 62,030 | 35,000 | 35,000 | 35,000 | 27,030 | 27,030 | 27,030 |
| **Cash Out-Flows** | | | | | | | | | |
| **Cost Out-Flows** | | | | | | | | | |
| **Operating Out-Flows** | | | | | | | | | |
| Advertising and Promotion | 388 | 388 | 388 | 388 | 388 | 388 | | | |
| Auto Expenses | 222 | 222 | 222 | 222 | 222 | 222 | | | |
| Cable TV | 799 | 799 | 799 | 799 | 799 | 799 | | | |
| Card Reader Service | 90 | 90 | 90 | 90 | 90 | 90 | | | |
| Computer and Internet Expenses | 164 | 164 | 164 | 164 | 164 | 164 | | | |
| Credit Card Expenses | 565 | 565 | 565 | 565 | 565 | 565 | | | |
| Elevator Expense | 336 | 336 | 336 | 336 | 336 | 336 | | | |
| Equipment Lease | 70 | 70 | 70 | 70 | 70 | 70 | | | |
| Insurance Expense/Workers Comp | 1,523 | 1,523 | 1,523 | 1,155 | 1,155 | 1,155 | 368 | 368 | 368 |
| Landscaping and Groundskeeping | 320 | 320 | 320 | 200 | 200 | 200 | 120 | 120 | 120 |
| Licenses & Permits | 868 | - | - | 868 | | | | | |
| Linen and Laundry | 842 | 842 | 842 | 842 | 842 | 842 | | | |
| Office Supplies | 1,100 | 1,100 | 1,100 | 1,050 | 1,050 | 1,050 | 50 | 50 | 50 |
| Outside Services - Maintenance | 1,287 | 1,287 | 1,287 | 1,100 | 1,100 | 1,100 | 187 | 187 | 187 |
| Payroll Fee | 244 | 244 | 244 | 244 | 244 | 244 | | | |
| Payroll Net Expense | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | | | |
| Payroll Taxes | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | | | |
| Pest Control | 138 | 138 | 138 | 78 | 78 | 78 | 60 | 60 | 60 |
| Miscellaneous | 130 | 130 | 130 | 130 | 130 | 130 | | | |
| Professional Fees | 125 | 125 | 125 | 125 | 125 | 125 | | | |
| Repairs and Maintenance | 3,640 | 3,640 | 3,640 | 2,360 | 2,360 | 2,360 | 1,280 | 1,280 | 1,280 |
| Reservations Service | 300 | 300 | 300 | 300 | 300 | 300 | | | |
| Security | 500 | 500 | 500 | 320 | 320 | 320 | 180 | 180 | 180 |
| Swimming Pool Service & Supplies | 375 | 375 | 375 | 375 | 375 | 375 | | | |
| Telephone Expense | 833 | 833 | 833 | 760 | 760 | 760 | 73 | 73 | 73 |
| Transient Occupancy Tax - Current | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | | | |
| Utilities | 7,346 | 7,346 | 7,346 | 5,832 | 5,832 | 5,832 | 1,514 | 1,514 | 1,514 |
| Vending Expense | 426 | 426 | 426 | 426 | 426 | 426 | | | |
| **Total Operating Out-Flows** | 41,130 | 40,262 | 40,262 | 37,299 | 36,431 | 36,431 | 3,832 | 3,832 | 3,832 |
| **Subtotal Operating Cash Flow** | 20,900 | 21,768 | 21,768 | (2,299) | (1,431) | (1,431) | 23,199 | 23,199 | 23,199 |
| **Other Cost Out-Flows** | | | | | | | | | |
| Property Taxes - Current | - | 28,316 | - | | 14,866 | | | 13,450 | |
| Property Taxes - Land | - | 868 | - | | 868 | | | | |
| **Total Other Cost Out-Flows** | - | 29,184 | - | - | 15,734 | - | - | 13,450 | - |
| **Total Cost Out-Flows** | 41,130 | 69,446 | 40,262 | 37,299 | 52,165 | 36,431 | 3,832 | 17,282 | 3,832 |
| **Net Cash In/(Out) Flow** | 20,900 | (7,416) | 21,768 | (2,299) | (17,165) | (1,431) | 23,199 | 9,749 | 23,199 |
| **Ending Cash** | 26,899 | 19,482 | 41,250 | 2,455 | (14,710) | (16,140) | 24,444 | 34,192 | 57,391 |

**EXHIBIT A**